Filed 1/27/23  Wheeler v. Safeway CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| RICHARD WHEELER, et al.,<br><br>       Plaintiff and Appellant,<br><br>   v.<br><br>SAFEWAY, INC.,<br><br>       Defendant and Respondent. | C095601<br><br>(Super. Ct. No. STK-CV-UBT-2016-0000176) |

This is a wage and hour class action lawsuit brought by truck drivers employed by defendant Safeway, Inc. (Safeway).  Plaintiff Richard Wheeler and others filed suit in 2016 following the settlement of two related wage and hour lawsuits in 2015.  In this action, plaintiffs allege, among other things, that Safeway continued to provide its drivers inadequate wage statements in violation of Labor Code section 226, subdivision (a).[1]

---

[1] Undesignated statutory references are to the Labor Code.

After the trial court issued two in limine rulings limiting Safeway's exposure to liability on the wage statement claim, including a ruling regarding the scope of the release provision in the settlement agreement encompassing the two related cases, the parties settled the remaining claims. Plaintiffs timely appeal, challenging the trial court's in limine rulings. We conclude the trial court erred and therefore reverse.

BACKGROUND

This case has a lengthy history involving the settlement of two related wage and hour lawsuits following years of litigation, which began in 2001 and includes two prior appeals. In view of the limited issues raised on appeal, we briefly summarize the pertinent facts and proceedings, which are largely set forth in our prior opinions: *Cicairos v. Summit Logistics, Inc*. (2005) 133 Cal.App.4th 949, 955-956 (*Cicairos*) and *Bluford v. Safeway Inc*. (2013) 216 Cal.App.4th 864, 866-867 (*Bluford*). Additional information is set forth as necessary *post* in the Discussion section.

*Relevant Facts Prior to June 2015*

Since 2003, Safeway has managed the operations of a distribution center in Tracy. (*Bluford, supra*, 216 Cal.App.4th at p. 866.) The plaintiffs in this case, like the plaintiffs in *Cicairos* and *Bluford*, are truck drivers who worked out of that distribution center, delivering goods to Safeway stores in Northern California and Nevada. (*Id*. at pp. 866-867.) Prior to 2003, the distribution center was operated by a third party, Summit Logistics, Inc. (Summit), for Safeway's benefit. (*Id*. at p. 867, fn. 1.)

The terms of the drivers' employment were governed by successive collective bargaining agreements, which provided for meal periods and rest breaks and specified the manner in which wages were calculated. (*Bluford, supra*, 216 Cal.App.4th at p. 867.) Safeway utilized an activity-based compensation system to determine the drivers' wages, which were calculated based on: (1) mileage rates applied according to the number of miles driven, the time of day the trips were taken, and the locations where the trips began and ended; (2) fixed rates for certain tasks (e.g., rates for the number of pallets delivered

2

and picked up); (3) an hourly rate for a predetermined amount of minutes for certain tasks (e.g., paid for 10 minutes at an hourly rate for set-up time at each store); and (4) an hourly rate for delays (e.g., breakdowns, impassable highways, time spent at scales, or other causes beyond the driver's control). (*Id*. at p. 867.) This compensation system is known as a piece-rate or incentive-based compensation system. (*Id*. at p. 871.) The only component of this system for which drivers are paid according to the "actual time" they spend on a task is delay time.

Drivers logged their mileage and activities for each trip manually on documents known as trip sheets. (*Bluford, supra*, 216 Cal.App.4th at p. 867.) They also logged their activities into an onboard computer system, which allowed Safeway to track their movement, including their stops. (*Id*. at pp. 867-868.) The drivers inputted codes into the system to record specific reasons for delays. (*Id*. at p. 868.)

As for wage statements, Safeway provided its drivers with a " 'driver trip summary—report of earnings' " (ROE)[2] and an " 'earnings statement' " with each paycheck. (*Bluford, supra,* 216 Cal.App.4th at p. 868.) The ROE listed each component of the driver's pay and the quantity of each component for which they were being paid. (*Ibid*.) The components and quantities were paid based on the rates set in the collective bargaining agreements. (*Ibid*.) The earnings statement itemized the actual components, and it expressed them in an equivalent hourly pay. (*Ibid*.) The delay time, paid at the driver's hourly rate, is also listed in the ROE.

The trip sheets were used to generate the drivers' earning statements and ROEs. Neither the earnings statements nor the ROEs stated the rates at which drivers were compensated for their mileage. (*Bluford, supra*, 216 Cal.App.4th at p. 868.)

---

[2] ROEs are sometimes referred to as SREs or SROEs in the appellate record.

The documents setting forth the rates (hourly, mileage, and activity) used to calculate the drivers' compensation were not included with the wage statements supplied to the drivers.[3] Safeway instructed the drivers to compare their earning statement and ROE with their trip sheets to ensure that they were paid the correct amount, and to speak with the transportation manager or a payroll clerk if they believed their pay was incorrect.

*Itemized Wage Statements*

Section 226, subdivision (a) requires an employer to provide its employees with an accurate itemized wage statement containing nine specified items. Among the items that must be in a wage statement include gross wages earned, total hours worked by the employee, the number of piece-rate units earned, and any applicable piece rate if the employee is paid on a piece-rate basis, all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee. (§ 226, subd. (a).)

An employer must provide a wage statement to its employees "semimonthly or at the time of each payment of wages" and furnish the statement "either as a detachable part of the check . . . paying the employee's wages, or separately if wages are paid by personal check or cash." (§ 226, subd. (a).) The wage statement *must* contain the information specified in the statute. (*Soto v. Motel 6 Operating, L.P.* (2016) 4 Cal.App.5th 385, 390 (*Soto*).)[4]

---

[3] Copies of these documents were placed in the "dispatch room" and provided to the drivers' union representative. Safeway advised drivers that the rates used to calculate their compensation could be obtained from the transportation manager, other managers, dispatchers, and the payroll office.

[4] Section 226, subdivision (a) states that an employer is *not* required to provide an accurate itemized statement showing total hours worked by the employee if any of the enumerated exceptions in subdivision (j) of the statute apply. (§ 226, subd. (a).) Safeway does not argue that any of these exceptions apply here.

4

"The core purpose of section 226 is 'to ensure an employer "document[s] the basis of the employee compensation payments" to assist the employee in determining whether he or she has been compensated properly.' " (*Ward v. United Airlines, Inc.* (2020) 9 Cal.5th 732, 752 (*Ward*); see *Maldonado v. Epsilon Plastics, Inc.* (2018) 22 Cal.App.5th 1308, 1337 [" ' " 'The purpose of requiring greater wage stub information is to insure that employees are adequately informed of *compensation received* and are not shortchanged by their employers' " ' "].) "Section 226 is part of a matrix of laws intended to ensure workers are correctly and adequately compensated for their work." (*Ward*, at p. 752.)

An employee may obtain the greater of actual damages or statutory penalties if he or she suffers injury as a result of a knowing and intentional failure by their employer to comply with section 226, subdivision (a). (§ 226, subd. (e)(1).) An employee is deemed to suffer injury if the employer fails to provide accurate and complete information as required by section 226, subdivision (a) and the employee cannot "promptly and easily determine from the wage statement alone" any of the enumerated items (e.g., piece-rate units earned, total hours worked). (*Id.*, subd. (e)(2)(B)(i).) A knowing and intentional violation occurs "if the employer 'knew that facts existed that brought its actions or omissions within the provisions of [the statute]' [citation] or, in other words, 'was aware of the factual predicate underlying the violation.' " (*Kao v. Holiday* (2017) 12 Cal.App.5th 947, 961.) "The employee is not required to demonstrate that the employer knew its conduct was unlawful." (*Furry v. East Bay Publishing, LLC* (2018) 30 Cal.App.5th 1072, 1085.)

"An actual injury is shown where 'there is a need for both additional documentation and additional mathematical calculations in order to determine whether Plaintiffs were correctly paid and what they may be owed.' [Citation.] In contrast, where the deficiency in the wage statement could be corrected by 'simple math,' there is no

actual injury." (*Raines v. Coastal Pacific Food Distributors, Inc.* (2018) 23 Cal.App.5th 667, 676 (*Raines*).)

*Related Cases*

The plaintiffs in *Cicairos* and the plaintiff in *Bluford* brought suit against their former/current employer (Summit/Safeway), alleging violations of statutory and regulatory laws related to meal and rest periods and itemized wage statements. (See *Cicairos, supra*, 133 Cal.App.4th at p. 952; *Bluford, supra*, 216 Cal.App.4th at pp. 866, 868.) Both *Cicairos* and *Bluford* involved the same wage and hour claims, which were predicated on similar allegations of wrongdoing.

In 2005, we issued a published opinion in *Cicairos* reversing the trial court's grant of summary judgment in favor of Summit. We concluded the evidence did not establish that Summit provided the plaintiffs with their required meal periods, paid rest periods, and adequately itemized wage statements. (*Cicairos, supra*, 133 Cal.App.4th at pp. 960-963.) In 2003, when Safeway took over control of the distribution center, it continued to utilize the same compensation structure and policies we subsequently disapproved in *Cicairos* until after *Cicairos* was issued. (*Bluford, supra*, 216 Cal.App.4th at p. 867, fn. 1.)

In May 2013, we reversed the trial court's order denying plaintiff's motion for class certification. (*Bluford, supra*, 216 Cal.App.4th at pp. 866, 874.) We concluded insufficient evidence supported the trial court's determination that individual issues predominated over common issues on the plaintiff's rest and meal period claims, and that plaintiff alleged a common injury resulting from the inadequate wage statements supplied by Safeway. (*Id.* at p. 866.) We reversed and remanded the matter with directions to grant plaintiffs' motion to certify the class, subdivided into three subclasses--rest, meal, and itemized wage statement classes. (*Id.* at pp. 866, 874.)

6

*The Cicairos/Bluford Settlement*

In October 2013, *Cicairos* and *Bluford* were related and assigned to the same superior court judge.[5]  In December 2014, the parties agreed to settle all of the claims alleged in both *Cicairos* and *Bluford*.  In February 2015, the parties executed a written settlement agreement memorializing the terms of the settlement (*Cicairos/Bluford* settlement or settlements).  The trial court granted preliminary approval of the settlement in March 2015.

In August 2015, the trial court granted final approval of the settlement.  Under the express terms of the settlement agreement, the judgment, which incorporated the settlement agreement, became final in October 2015.

*June 2015 Changes to Safeway's Employment Practices*

Prior to June 2015, Safeway did not include rest breaks in the list of "delay codes" for which extra pay was provided to drivers.

Beginning on June 14, 2015, Safeway implemented certain changes to its rest break practices and wage statements, which, as we noted *ante*, are comprised of two documents:  an earning statement and a more detailed ROE providing more information associated with the particular work of the driver.  Drivers were provided a revised ROE that included rest breaks as a separate entry, and a new "Journal Entries" section showing each driver's total break minutes for the week and their rest break pay rate.  The revised ROE also included entries for the following:  (1) activity-based pay (the rate at which each element of the activity-based compensation system was paid per the collective bargaining agreement); (2) mileage-based pay (the miles driven during each leg of a trip that a separate mileage rate applied per the collective bargaining agreement, the amount paid for each leg, and the total amount of mileage pay for the week); and (3) total hours worked, exclusive of rest break minutes.

---

[5]  The record reflects that the order relating the cases was not filed until January 2016.

7

According to Safeway, "[w]ith these revisions, both the rates and the number of piece-rate units earned for every sub-element of drivers' pay (minutes, miles and activities) were itemized on drivers' [ROE], whereas the rates had previously been provided to the drivers on related documents distributed to the drivers by . . . managers."

*January 2016 Changes to Safeway's Employment Practices*

In January 2016, Safeway implemented additional changes to its wage statements. Beginning on or about January 13, 2016, Safeway revised its "wage documents" to include subtotals listing the amount paid for each type of activity, and a footnote explaining the method of calculation for rest break pay. Around that same time, Safeway revised the ROE by adding an entry for total compensation and by including rest break time in the calculation of total hours worked.[6]

*Present Lawsuit*

In January 2016, Wheeler and others[7] filed a wage and hour class action complaint against Safeway, alleging violations of statutory and regulatory laws related to rest periods and itemized wage statements as well as a derivative claim under the unfair competition law. The allegations supporting these claims were similar to the allegations supporting the claims alleged in *Cicairos* and *Bluford*.

In this action, the rest period claim is limited to Safeway's conduct from March 10, 2015, to June 13, 2015--the three-month period from the preliminary approval of the *Cicairos/Bluford* settlement to the day before Safeway implemented changes to its rest break practices. The wage statement claim is limited to Safeway's conduct after the

---

[6] In July 2019, Safeway revised the ROE by adding an entry for the chain bonus, which was additional compensation paid to drivers for installing and removing chains from their truck's tires.

[7] Wheeler was one of the named plaintiffs in *Cicairos*. Another named plaintiff in this action, Kenneth Bluford, was the only named plaintiff in *Bluford*. All of the originally named plaintiffs in this action were members of the *Cicairos/Bluford* settlement class.

preliminary approval of the settlement--March 10, 2015, to the present. According to plaintiffs, Safeway's wage statements continued to be inadequate after the settlement was approved on March 9, 2015. Specifically, plaintiffs allege that the wage statements were deficient because they failed to indicate the rate of pay associated with each task performed (i.e., the piece-rates comprising the driver's compensation), contain an accurate report of all hours worked, contain a separate component for rest breaks for the three-month period from March 10, 2015, to June 13, 2015, or otherwise comply with section 226. Plaintiffs asserted that, without this information, they and other drivers could not easily verify the accuracy of the wages paid.

*Motion for Class Certification*

In December 2018, the trial court granted plaintiffs' motion for class certification, which, as relevant here, included certification of a subclass of "all current and former Safeway drivers not provided accurate itemized wage statements from March 10, 2015 to the present." In certifying this subclass, the trial court found that all of the drivers were subject to Safeway's common payroll system and its methods of compensating drivers (i.e., piece-rate compensation system), and were provided earning statements and ROEs "made up of identical elements," raising issues of law and facts common to all proposed class members.

*Motions for Summary Adjudication*

In January 2019, the trial court denied Safeway's motion for summary adjudication. Of relevance here, Safeway sought a determination that all members of the *Cicairos/Bluford* settlement class were barred from seeking recovery on any wage statement issued on or before the "effective date" of the settlement--that is, the date the judgment in *Cicairos/Bluford*, which incorporated the settlement agreement, became final on October 8, 2015. Safeway's 30th affirmative defense asserted: "The Complaint, and

9

each cause of action therein, is barred, in whole or in part, because Plaintiffs' claims have been released pursuant to a prior settlement agreement with Defendant."[8]

In support of its motion, Safeway argued that, under the unambiguous terms of the settlement agreement, the settling class members agreed to release all claims that were or could have been brought against Safeway up to the effective date of the settlement. In denying the motion, the trial court found that the "clear language" of the settlement agreement indicated that the release was for "the class period only," which was defined as January 1, 2000, to March 9, 2015--the date the *Cicairos/Bluford* settlement was preliminary approved.

In October 2020, the trial court granted summary adjudication in favor of Safeway on plaintiffs' rest period claim. The court explained that, in December 2018, the Federal Motor Carrier Safety Administration determined that California's meal and rest break rules were preempted under federal law and could not be applied to truck drivers.

In December 2020, the trial court denied plaintiffs' motion for summary adjudication of the wage statement claim, which sought a determination that Safeway's wage statements were deficient as a matter of law during the relevant period--March 10, 2015, to the present. In support of their motion, plaintiffs raised several arguments we need not discuss because they are not pertinent to the issues on appeal, including arguments that concern the three-month period from March 10, 2015, to June 13, 2015. As relevant here, the trial court rejected plaintiffs' contention that the wage statements issued on and after June 14, 2015 (i.e., after Safeway made changes to the statements following the *Cicairos/Bluford* settlement), were inadequate as a matter of law under section 226 because the mileage rates provided did not include the start time for each leg

---

[8] As discussed more fully *post*, it is undisputed that the "effective date" of the *Cicairos/Bluford* settlement was October 8, 2015--60 days after the trial court granted final approval of the settlement agreement on August 8, 2015.

10

of a trip and indicate whether the rates applied were peak or non-peak rates, thereby preventing drivers from ascertaining whether the rates stated on their wage statements were correct without cross-referencing another document.[9] The court explained that, because there was nothing in the statute requiring that a wage statement include the basis of the piece-rate paid, plaintiffs had failed to establish a statutory violation due to the omission of an explanation indicating whether the rate paid was a peak or non-peak rate.

The trial court did not specifically rule on plaintiffs' contention that the wage statements issued on or after June 14, 2015, were inadequate as a matter of law under section 226 because they contained two or more calculations of total hours, resulting in confusion and injury to drivers as the statements did not clearly and accurately provide drivers with the total hours worked. However, the court found the wage statements issued from March 10, 2015, to June 13, 2015, did not violate section 226 as a matter of law, even though it was undisputed that they did not include the total hours worked. Citing the Department of Labor Standards Enforcement (DLSE) Manual, the court determined that Safeway was not required to supply drivers with this information because drivers were not compensated based on an hourly rate.

*Safeway's Motions in Limine*

In mid-April 2021, in anticipation of trial in early May 2021, Safeway filed two motions in limine.[10]

Relying on the terms of the *Cicairos/Bluford* settlement agreement, Safeway's Motion in Limine No. 1 sought to prevent plaintiffs from presenting any evidence or argument regarding wage statements issued to members of the *Cicairos/Bluford* settlement class on or before October 8, 2015--the date the judgment incorporating the

---

[9] The peak rate premium applies when a driver's trip starts at "certain times of day."

[10] We refer, as the trial court did, to Safeway's motions in limine as Motion in Limine No. 1 and Motion in Limine No. 2.

11

settlement agreement became final. In support of this motion, Safeway argued that evidence regarding these wage statements was irrelevant because the settling class members released all of their wage statement claims arising on or before October 8, 2015, under the express terms of the *Cicairos/Bluford* settlement agreement.

Safeway's Motion in Limine No. 2 sought to prevent plaintiffs from presenting any evidence or argument regarding wage statements issued on or after June 14, 2015. In support of this motion, Safeway argued that such evidence was irrelevant because the wage statements issued during this time period did not violate section 226 as a matter of law, and that, in any event, plaintiffs could not establish injury as a matter of law. As for the alleged deficiencies in the wage statements, Safeway argued that contrary to plaintiffs' contention, the ROEs issued on or after June 14, 2015, itemized all hours for which drivers were paid and included the total hours worked, even though this amount is irrelevant to their compensation. Safeway further argued that contrary to plaintiffs' contention, section 226 does not require an employer to explain the basis for an employee's pay rate, and therefore the ROEs did not need to specify whether a driver was paid a peak or non-peak rate for miles driven. As for the injury element, Safeway argued that plaintiffs could not establish this element as a matter of law because they "admitted in their depositions" that, beginning in June of 2015, their ROEs contained all the necessary information to determine what they were paid. In support of this argument, Safeway cited to the deposition testimony of four of the six named plaintiffs. Safeway added that plaintiffs' "vague allegation" that the ROEs issued after the "June 2015 revisions" were confusing and failed to reflect accurate information, cannot form the basis for a class-wide determination that Safeway's wage statements were inadequate. Three days later, plaintiffs filed a written objection to Motion in Limine No. 2, arguing that it was an untimely and improper dispositive motion. The objection noted that Safeway had not complied with the procedural requirements of the summary judgment statute and submitted over 500 pages of materials in support of its motion.

12

At the motion in limine conference the next day, plaintiffs lodged the same objection and asserted that they were entitled to a "full summary judgment briefing" on the issue raised in Motion in Limine No. 2. The trial court did not grant plaintiffs' request, but instead ordered supplemental briefing and set a hearing 11 days later. The court indicated, without elaboration, that its tentative ruling was to grant both of Safeway's motions.

After a hearing and the submission of additional briefing, in which plaintiffs argued that *both* of Safeway's motions should be denied as procedurally improper and because they lacked substantive merit, the trial court granted Safeway's motions. These rulings effectively limited relief on the wage statement claim to current class members who were *not* members of the *Cicairos/Bluford* settlement class and were employed by Safeway during the three-month period from March 10, 2015, to June 14, 2015.

In granting Safeway's Motion in Limine No. 1, the trial court acknowledged that it was, in essence, reconsidering its prior ruling denying Safeway's motion for summary adjudication on its 30th affirmative defense concerning the release provision in the *Cicairos/Bluford* settlement agreement. The court explained that it was bifurcating this issue and deciding it prior to trial because the issue presented a question of law. As for Motion in Limine No. 2, the trial court provided no explanation for its ruling. Importantly, the court did not indicate whether it was granting the motion because there was no violation of section 226, subdivision (a) as a matter of law, and/or because plaintiffs could not, as a matter of law, establish the injury element of a wage statement claim under section 226, subdivision (e).

*Remaining Claims and Judgment, Appeal*

Following the trial court's in limine rulings, the parties agreed to settle the remaining claims. Thereafter, the matter was dismissed pursuant to stipulation. Judgment was entered in December 2021. Plaintiffs timely appealed. The case was fully

13

briefed on September 13, 2022, and assigned to this panel on September 30, 2022.  The parties requested argument and the cause was heard and submitted on January 17, 2023.

DISCUSSION

I

*Disguised Dispositive Motions*

We begin by addressing plaintiffs' contention that the trial court erred in considering Safeway's motions in limine.  Plaintiffs argue the motions should have been denied as untimely filed dispositive motions disguised as motions in limine.  As we next explain, we agree only as to Safeway's Motion in Limine No. 2.

A.  *Applicable Legal Principles*

"Motions in limine are designed to facilitate management of a case by deciding difficult evidentiary issues in advance of trial." (*McMillin Companies, LLC v. American Safety Indemnity Co.* (2015) 233 Cal.App.4th 518, 529.)  " ' "The usual purpose of motions in limine is to preclude the presentation of evidence deemed inadmissible and prejudicial by the moving party.  A typical order in limine excludes the challenged evidence . . . .  [Citation.]  'The advantage of such motions is to avoid the obviously futile attempt to "unring the bell" in the event a motion to strike is granted in the proceedings before the jury.' " ' " (*Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1593 (*Amtower*), italics omitted.)

Dispositive motions in limine are disfavored.  Motions in limine are not designed to replace the dispositive motions prescribed by the Code of Civil Procedure, such as motions for summary adjudication, and when used in this fashion they may circumvent procedural protections provided by the statutory motions or by a trial on the merits; they risk blindsiding the nonmoving party and could infringe on the right to a jury trial.  (*Tung v. Chicago Title Company* (2021) 63 Cal.App.5th 734, 758; *Blanks v. Seyfarth Shaw, LLP* (2009) 171 Cal.App.4th 336, 375; *Amtower, supra*, 158 Cal.App.4th at pp. 1593-1594; see *R & B Auto Center, Inc. v. Farmers Group, Inc.* (2006) 140 Cal.App.4th 327, 350

14

(*R & B*) [discouraging use of motions in limine to achieve summary adjudication].) "No matter how logical a moving party's motion may sound, a judge generally should not be weighing the evidence on a motion in limine. . . . While it may be tempting to look at a case in the macro sense, the devil is in the details. The moving party's concerns that the other party may be trying to use evidence for an improper purpose or in a way that may be unduly prejudicial can be addressed by limiting instructions, without taking away the other party's hallowed right to a jury trial." (*R & B*, at p. 333.)

Although dispositive motions in limine are disfavored, they are not prohibited. Entertaining a "nontraditional" motion in limine falls within the trial court's inherent power to control litigation and conserve judicial resources. (See *Amtower, supra*, 158 Cal.App.4th at p. 1595 ["In spite of the obvious drawbacks to the use of in limine motions to dispose of a claim, trial courts do have the inherent power to use them in this way"]; *Kinda v. Carpenter* (2016) 247 Cal.App.4th 1268, 1285 (*Kinda*) [same].) However, the better practice in nearly every case in which a motion in limine is brought as a substitute for a dispositive statutory motion is to afford the litigant the protections provided by trial or by the statutory processes. (*Pellegrini v. Weiss* (2008) 165 Cal.App.4th 515, 530.) As an example, a motion in limine that seeks to exclude all evidence pertaining to all or part of a cause of action on the ground that the plaintiff lacks evidence to support all or part of the cause of action is merely a disguised motion for summary adjudication and should not be permitted. (*Johnson v. Chiu* (2011) 199 Cal.App.4th 775, 778; *Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 124.)

B. *Analysis*

First, as to Safeway's Motion in Limine No. 1, we see no abuse of discretion. As the trial court noted, this motion effectively sought reconsideration of the court's prior ruling denying Safeway's motion for summary adjudication on its 30th affirmative defense, which concerned the scope of the release provision in the *Cicairos/Bluford* settlement agreement. Although we also accept the premise that motions in limine should

not replace dispositive motions prescribed by the Code of Civil Procedure (*Amtower, supra*, 158 Cal.App.4th at p. 1593), the issue raised in Motion in Limine No. 1 involved the proper interpretation of the release provision in the settlement agreement. This was a question of law for the court to decide, as the language of the settlement agreement is unambiguous and there was no conflicting extrinsic evidence bearing upon its meaning. (*City of Hope National Medical Center v. Genentech Inc*. (2008) 43 Cal.4th 375, 395; *Chacon v. Union Pacific Railroad* (2020) 56 Cal.App.5th 565, 573.) Under these circumstances, the trial court acted well within its authority in ruling on the motion. There was no need for the procedural protections provided by trial or the statutory processes for dispositive motions. (See *Salehi v. Surfside III Condominium Owners' Assn*. (2011) 200 Cal.App.4th 1146, 1159 [rejecting claim that the trial court improperly determined, in response to a motion in limine, whether release in settlement agreement barred current claims].)

However, as to Motion in Limine No. 2, we reach a different conclusion. That motion concerned the legal adequacy of the wage statements issued to drivers on or after June 14, 2015. In granting this motion, the trial court effectively granted summary adjudication in favor of Safeway on all wage statement claims predicated on wage statements issued on or after June 14, 2015, without the procedural protections associated with summary adjudication proceedings or by trial on the merits. This was an abuse of discretion. While the excluded evidence might not have been sufficient to establish liability, Safeway did not follow the proper procedure for adjudicating this portion of plaintiffs' wage statement claim before trial. (See Code Civ. Proc., § 437c, subd. (t) [explaining procedure for summary adjudication of legal issue or claim for damages that does not completely dispose of a cause of action].) Indeed, Safeway waited until the eve of trial, more than five years after this suit was filed, to file what was in effect a motion for partial summary adjudication. The motion was procedurally improper. (See *R & B, supra*, 140 Cal.App.4th at p. 371 ["[t]o have the sufficiency of the pleading or the

16

existence of triable issues of material fact decided in the guise of a motion in limine is a perversion of the process"] (conc. opn. of Rylaarsdam, J.).) In any event, as we explain *post*, the procedural issue notwithstanding, the trial court erred in granting the motion.

II

*Merits of Safeway's Motions in Limine*

Next, we turn to the merits of Safeway's motions in limine. As we shall explain, we agree with plaintiffs that the trial court erred in granting the motions.

A. *Standard of Review*

While we generally review orders on motions in limine for abuse of discretion, our review is de novo when the issue is one of law. (*Reynaud v. Technicolor Creative Services USA, Inc.* (2020) 46 Cal.App.5th 1007, 1021; *Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260, 1277.)

When a motion in limine is granted at the outset of trial with reference to evidence already produced in discovery, it " 'may be viewed as the functional equivalent of an order sustaining a demurrer to the evidence, or nonsuit.' " (*K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.* (2009) 171 Cal.App.4th 939, 952.) In ruling on the motion, the trial court must interpret the evidence most favorably to plaintiff's case and resolve all presumptions, inferences and doubts in favor of plaintiff. (*Kinda, supra*, 247 Cal.App.4th at pp. 1285-1286.) " ' "Because a grant of the motion serves to take a case from the jury's consideration, courts traditionally have taken a very restrictive view of the circumstances under which nonsuit is proper. The rule is that a trial court may not grant a defendant's motion for nonsuit if plaintiff's evidence would support a jury verdict in plaintiff's favor." ' " (*Id*. at p. 1285.)

B. *Safeway's Motion in Limine No. 1*

1. *Applicable Legal Principles*

A settlement agreement is a contract; therefore, the legal principles that apply to contracts also apply to settlement agreements. (*Sully-Miller Contracting Co. v.*

17

*Gledson/Cashman Construction, Inc*. (2002) 103 Cal.App.4th 30, 36; *General Motors Corp. v. Superior Court* (1993) 12 Cal.App.4th 435, 439.)  The proper interpretation of a contract is a judicial function when, as here, it does not turn upon the credibility of extrinsic evidence.  (*Parsons v. Bristol Development Co*. (1965) 62 Cal.2d 861, 866; *Garcia v. Truck Ins. Exchange* (1984) 36 Cal.3d 426, 439.)

"California recognizes the objective theory of contracts [citation], under which '[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation'  [citation].  The parties' undisclosed intent or understanding is irrelevant to contract interpretation."  (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956.)

" ' "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." ' "  (*Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390.)  " 'In interpreting an unambiguous contractual provision[,] we are bound to give effect to the plain and ordinary meaning of the language used by the parties.'  [Citation.]  Thus, where ' "contract language is clear and explicit and does not lead to absurd results, we ascertain intent from the written terms and go no further." ' "  (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co*. (2003) 107 Cal.App.4th 516, 524; see *Powerine*, at p. 390 [" ' "If contractual language is clear and explicit, it governs" ' "].)  If possible, we must give effect to every provision and word of a contract and avoid an interpretation that renders a word or part of the contract surplusage, inoperative, or meaningless.  (*In re Tobacco Cases I* (2010) 186 Cal.App.4th 42, 49; *National City Police Officers' Ass'n v. City of National City* (2001) 87 Cal.App.4th 1274, 1279; *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 473.)

2. *Analysis*

The *Cicairos/Bluford* settlement agreement defined the "Settlement Class" to include "all persons who, from January 1, 2000, up to and including the date that the Superior Court grants preliminary approval of this Settlement, have previously been or currently are employed by Summit or Safeway as drivers at the distribution center located in Tracy, California." The agreement defined the "Class Period" to mean "the period of time from January 1, 2000, to the date of the Preliminary Approval of the Settlement." It is undisputed that the settlement was preliminarily approved on March 9, 2015, and that the "effective date" of the settlement agreement was October 8, 2015--the date the judgment, which incorporated the settlement agreement, became final.[11]

In relevant part, the general release provision in the *Cicairos/Bluford* settlement agreement states: "*As of the date the Judgment becomes Final*, Plaintiffs, the Class, and each Class Member who has not been excluded from the Settlement . . . shall and does hereby fully and finally release Summit . . . and Safeway . . . from any and all claims,

---

[11] The *Cicairos/Bluford* settlement agreement defined the "Effective Date" as the date by which the agreement is "approved by the Superior Court by entry of the Judgment and the Judgment becomes Final. The Judgment becomes 'Final' when the later of the following events occurs: (1) the period for filing any appeal, writ, or other appellate proceeding opposing the Settlement has elapsed without any appeal, writ, or other appellate proceeding having been filed; (2) any appeal, writ, or other appellate proceeding opposing the Settlement has been dismissed finally and conclusively with no right by any appellant or objector to pursue further remedies or relief; or (3) any appeal, writ, or other appellate proceeding has upheld the Judgment with no right by any appellant or objector to pursue further remedies or relief. In this regard, it is the intention of the Parties that the Settlement shall not become effective until the Court's Judgment granting final approval of the Settlement is completely final, and there is no further recourse by an appellant or objector who seeks to contest the Settlement. The occurrence of the Effective Date is a prerequisite to any obligation of Defendants to pay any funds into the Settlement Account." The trial court granted final approval of the settlement and entered judgment on August 9, 2015. Therefore, since no appeal was filed, the parties agree that the judgment became final on October 8, 2015. (See Cal. Rules of Court, rule 8.104(a).)

demands, rights, liabilities, and causes of action of any kind whatsoever, whether known or unknown, that have been, or could have been, asserted against [Safeway and/or Summit] arising out of or relating to the claims, causes of action, facts, or allegations set forth in the *Cicairos* Action and the *Bluford* Action *during the Class Period*." (First italics added.)

Reading the terms of the *Cicairos/Bluford* settlement agreement together as a whole, and giving effect to the plain and ordinary meaning of every provision and word, we conclude the general release provision does not encompass any of the claims asserted in this action, including the remaining wage statement claim and the derivative unfair competition law claim. The conduct on the part of Safeway giving rise to these claims occurred on or after March 10, 2015. That is, after the date the trial court preliminarily approved the settlement agreement on March 9, 2015. The plain unambiguous language of the settlement agreement provides that, upon the date the judgment, which incorporated the settlement agreement, becomes final, the class members release Safeway and Summit from any and all claims, whether known or unknown, that have been or could have been asserted against Safeway and Summit "arising out of or relating to the claims, causes of action, facts, or allegations in the *Cicairos* Action and the *Bluford* Action *during the Class Period*" (third italics added)--i.e., the period from January 1, 2000, to March 9, 2015.

We disagree with the trial court's interpretation of the settlement agreement, which Safeway urges us to adopt on appeal. As written, the release provision cannot properly be interpreted to encompass all claims the class members asserted or could have asserted against Safeway up to the date the judgment incorporating the settlement agreement became final on October 8, 2015. Had the parties intended such a meaning,

20

they could have easily said so in clear and certain terms.[12] Instead, the parties agreed that the class members released all claims that were or could have been asserted against Summit and Safeway arising out of or relating to the claims or allegations in the *Cicairos* and *Bluford* actions *during the class period*--i.e., from January 1, 2000, to March 9, 2015. Therefore, only wage and hour claims that were or could have been asserted against Summit and/or Safeway prior to March 9, 2015, were released by the class members. (*Villacres v. ABM Industries Inc.* (2010) 189 Cal.App.4th 562, 588 [a general release containing broad language such as the phrase " ' "any and all claims that were or could have been asserted by [the plaintiff] in the [present lawsuit]" ' " have consistently been held by the courts to constitute a waiver of " 'all "claims based upon events occurring prior to the date of the release" ' "].) Accordingly, because the trial court reached a different conclusion, we must reverse the resulting ruling. The court's interpretation does not give effect to the plain and ordinary meaning of the language used by the parties and renders the phrase "during the Class Period" meaningless. In our view, the clear intent of this phrase was to limit the temporal scope of the general release provision.

---

[12] In addition to the general release provision, the settlement agreement included a provision titled, "Additional Claims Released by the Plaintiffs." In relevant part, that provision stated that the named plaintiffs agreed, as of the date the judgment became final, to release Safeway and Summit from "all known and unknown claims they may have against [them], *of every nature or description whatsoever* [e.g., contract, tort, constitutional, wrongful discharge claims], *up to the date of their execution of this Agreement*," which occurred in February 2015. (Italics added.) This provision taken together with the general release provision shows that the parties negotiated specific dates that apply to the release of claims. Had the parties intended for a broader release period for the class members, as Safeway contends, they could have specified that the general release applied to all wage and hour claims, and any derivative or related claims, that were or could have been asserted against Summit/Safeway from January 1, 2000, *up to the date the judgment incorporating the settlement agreement becomes final* or *up to the effective date of the settlement agreement*.

*Schulte v. Fifth Third Bank* (N.D. Ill., June 15, 2012, No. 09 C 6655) 2012 WL 2254197 (*Schulte*), on which Safeway primarily relies and which the trial court found "compelling" and "very similar", does not support a contrary conclusion. In *Schulte*, a case involving overdraft fees charged by a bank on debit card transactions, the class period ended on July 1, 2010, the settlement agreement *required* the bank to make a certain change to its business practices by April 1, 2011, and the settlement agreement had an effective date of October 28, 2011. (*Schulte, supra*, 2012 WL 2254197 at pp. *1-2.) The settlement agreement contained a broad release that stated: "As of the Effective Date, Plaintiff and each and every Settlement Class Member shall be deemed to have fully released and forever discharged Fifth Third [Bank] . . . from any and all rights, claims, actions, causes of action, demands and remedies, known or unknown, liquidated or unliquidated, legal, statutory, or equitable, that result from, arise out of, are based upon, or related to in any way to the conduct, omissions, duties or matters alleged in the Complaints, including claims related . . . in any way, upon the use of a Fifth Third [Bank] Debit Card by the cardholder or by an authorized user of the debit card that led to the assessment of one or more Overdraft Fees." (*Id.* at p. *1.) The district court in *Schulte* granted the bank's motion to enforce the settlement against a settling class member, finding that the release provision barred all claims brought by a settling class member that were based on debit card transactions before the effective date of the settlement agreement--October 28, 2011. (*Id.* at pp. *2-4.) The district court rejected the contention that the release provision did not encompass claims arising after the class period--July 1, 2010. (*Id.* at p. *2.) The district court relied on the broad language of the release provision, and added that settling class members knew or should have known that it was possible for overdraft fees to be assessed against them after the class period, as the express terms of the settlement agreement gave the bank until April 2011 to make a certain change to its business practices regarding overdraft fees. (*Id*. at p. *3.)

*Schulte* is inapposite. Here, unlike in *Schulte*, the parties agreed to limit the release of claims by settling class members to those claims that were or could have been asserted against Summit and/or Safeway arising out of or related to the claims and allegations set forth in the *Cicairos* and *Bluford* actions *during the class period.* Further, the terms of the settlement agreement do not include a provision requiring Safeway to make any change to its business practices related to wage statements by a certain date after the class period.[13] *Schulte* is clearly distinguishable. And none of the other cases relied upon by Safeway involve a release provision containing similar language to that at issue here.

C. *Safeway's Motion in Limine No. 2*

As we have discussed, Motion in Limine No. 2 sought to prevent plaintiffs from presenting any evidence or argument regarding wage statements issued on or after June 14, 2015. In support of this motion, Safeway argued that such evidence was irrelevant because the wage statements issued during this time period did not violate section 226, subdivision (a) as a matter of law, and that, in any event, plaintiffs could not establish injury as a matter of law under section 226, subdivision (e). Because this motion was, in effect, a motion for partial summary adjudication of the wage statement claim (see Code Civ. Proc., § 437c, subd. (t)), in granting the motion, the trial court deprived plaintiffs of the procedural protections associated with summary adjudication proceedings and the opportunity to put on their case as to wage statements issued on or after June 14, 2015, the date Safeway implemented certain changes to its wage statements.

---

[13] The record reflects that, in connection with the motion for preliminary approval, Safeway's counsel represented that Safeway was in the process of designing a new wage statement that would comply with the requirements of section 226, and that Safeway would provide a declaration to that effect in support of the motion for final approval of the settlement.

This ruling, which was the " 'functional equivalent of an order sustaining a demurrer to the evidence, or nonsuit,' " (*K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc., supra*, 171 Cal.App.4th at p. 952), was an error. As we next explain, because there was evidence that would have supported a jury verdict in plaintiffs' favor as to this portion of the wage statement claim; thus, this portion of the wage statement claim did not fail as a matter of law. (See *Kinda, supra*, 247 Cal.App.4th at p. 1285 ["The rule is that a trial court may not grant a defendant's motion for nonsuit if plaintiff's evidence would support a jury verdict in plaintiff's favor"].)

Because the trial court did not provide any reasons for granting Safeway's Motion in Limine No. 2, we will address each of the grounds raised by Safeway in support of its motion. As described *ante*, Safeway argued that the wage statement claim failed as a matter of law as to wage statements issued on or after June 14, 2015, for three reasons: (1) the wage statements itemized all hours worked and included the total hours worked, and therefore did not violate section 226, subdivision (a); (2) section 226, subdivision (a) does not require an employer to explain the basis for the applicable piece-rate(s) if the employees is paid on a piece-rate basis, and therefore the ROE's are not deficient for failing to specify whether a driver is paid peak or non-peak rate for miles driven; and (3) plaintiffs "admittingly" could not establish the injury element under section 226, subdivision (e).

### 1. *Total Hours Worked*

The sole relevant earning statement and ROE that Safeway submitted in support of its motion does not establish that the wage statements issued on and after June 14, 2015, complied with section 226 as a matter of law. The ROE states that the driver worked a total of 54 hours and 17 minutes. However, it is unclear from the face of the document how that number was calculated. The ROE shows the time the driver was dispatched, how many miles traveled, stops, delay minutes, and other categories. It does not,

24

however, show how many hours the driver worked each day.[14] The driver's earning statement indicates, under the description "Prog/Trst Units Act Base," that he worked 69.05 hours. According to Safeway, this entry identifies the hours credited to the driver's client trust account, which is a preset number negotiated under the collective bargaining agreement. The entry represents the total amount paid for all activity components of a driver's compensation other than the mileage component.

Taken together, the face of the earning statement and ROE do not support the conclusion that Safeway provided drivers adequate wage statements as a matter of law. Safeway, for its part, has not cited any legal authority or provided meaningful legal analysis persuading us otherwise.

### 2. *Basis for Applicable Piece-Rates*

To the extent the trial court found, as argued by Safeway, that the wage statements issued on or after June 14, 2015, were adequate despite the omission of an explanation as to the basis for the piece-rates that applied to each mile driven, this was in error. Plaintiffs' theory of liability in this regard is that Safeway supplied inadequate wage statements by failing to provide sufficient information to enable drivers to verify whether the correct rate was applied to each piece-rate mile driven. According to plaintiffs, because the applicable piece-rate varies between zones based on the time of day a trip is taken, drivers are entitled to information as to which piece-rate applied, including information specifying whether the trip occurred during a "peak" period, which would trigger a higher rate of pay. Plaintiffs assert that without this information, there is no way to ensure the accuracy of the piece-rate applied unless they cross-reference other

---

[14] In *Cicairos*, we concluded Summit failed to provide wage statements that met the requirements of section 226 because the ROEs did not show how many hours the driver worked each day or during the pay period. (*Cicairos, supra*, 133 Cal.App.4th at pp. 960-961.)

documents. In support of its in limine motion, Safeway argued, and the trial court apparently agreed, that section 226, subdivision (a) does not require an employer to explain the basis for *how* each piece-rate was determined. Rather, it only requires that wage statements include the applicable piece-rate and the number of piece-rate units earned. We disagree with this construction of the statute.

"We independently determine the meaning of a statute." (*Soto, supra*, 4 Cal.App.5th at p. 390.) "When construing a statute, a court's goal is 'to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.' " (*Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 567.) " '[A] court's "overriding purpose" in construing a statute is "to give the statute a *reasonable* construction conforming to [the Legislature's] intent [citation]. . . ." ' [Citations.] 'The court will apply common sense to the language at hand and interpret the statute to make it workable and reasonable.' " (*Ibid.*)

"In construing a statute, we consider 'the object to be achieved and the evil to be prevented by the legislation." [Citations.] Section 226(a) is intended to require employers to provide an adequate wage statement, itemizing the information to be included, 'to assist the employee in determining whether he or she has been compensated properly.' " (*Raines, supra*, 23 Cal.App.5th at p. 675; "Section 226 'play[s] an important role in vindicating [the] fundamental public policy' favoring ' " 'full and prompt *payment* of an employee's earned wages. . . .' " ' " (*Soto, supra*, 4 Cal.App.5th at p. 390.) "As a remedial statute, section 226 'must be liberally construed in favor of affording workers protection.' " (*Gunther v. Alaska Airlines, Inc.* (2021) 72 Cal.App.5th 334, 346; see *Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1103 ["statutes governing conditions of employment are to be construed broadly in favor of protecting employees"].)

As previously indicated, an employee is deemed to suffer injury if the employer fails to provide accurate and complete information as required by section 226,

subdivision (a) and the employee cannot promptly and easily determine from the wage statement alone any of the enumerated items (e.g., piece-rate units earned). (§ 226, subd. (e)(2)(B)(i); see *id.*, subd. (e)(2)(C) [" 'promptly and easily determine' means a reasonable person would be able to readily ascertain the information without reference to other documents or information"].) "An actual injury is shown where 'there is a need for both additional documentation and additional mathematical calculations in order to determine whether Plaintiffs were correctly paid and what they may be owed.' " (*Raines, supra*, 23 Cal.App.5th at p. 676.)

We conclude that when, as here, an employee is subject to a piece-rate compensation system, the employer must provide the employee a wage statement that clearly explains how their compensation was calculated, including the applicable piece-rate formula for each specific task performed and any other information necessary to calculate the employee's compensation for that task. Without such information, the core purpose of section 226--to assist an employee in determining whether he or she has been properly compensated--would not be served. We fail to see how an employee subject to a piece-rate compensation system could promptly and easily determine whether they were correctly paid when the piece-rate for a particular task varies depending on certain factors, and there is no explanation or adequate information in the wage statement showing why a particular piece-rate was applied for that task. Indeed, the ROE submitted by Safeway for the trial court's consideration shows that four different piece-rates applied to a trip involving four stops on a single day. But there is no way for the driver to verify the accuracy of this information without referencing another document or set of documents. And there is no indication as to whether peak or non-peak rates applied to any leg of that trip and an explanation why. Only the start time of the trip is provided, and there is no indication of when the first leg of the trip ended or when any of the other legs of the trip began and ended.

27

### 3. *Injury Element*

Finally, to the extent the trial court found that plaintiffs could not establish the injury element as a matter of law, this was an error. Nothing in the record supports such a conclusion. In the trial court, Safeway argued that plaintiffs could not identify any "injury" caused by wage statements issued on or after June 14, 2015. But they did. The asserted injury was Safeway's failure to provide accurate and complete information required under section 226, subdivision (a), including sufficient information regarding total hours worked and applicable piece-rates. And, as we have discussed, there was evidence to support a finding in favor of plaintiffs on this issue at trial. It is not readily apparent from the face of the wage statement it contained adequate information to enable the driver to promptly and easily determine the accuracy of total hours worked or piece-rate units earned. (See § 226, subd. (e)(2)(B)(i).) In short, the injury element of the wage statement claim was a question of fact for the jury to decide based on the wage statement alone. (See *Garnett v. ADT, LLC* (E.D. Cal. 2015) 139 F.Supp.3d 1121, 1132-1133 [injury requirement satisfied where employee could not "readily ascertain" her total hours worked from information provided on her wage statement].)

We find no merit in Safeway's contention that the trial court did not err because plaintiffs admitted they could not establish the injury element. Safeway has not directed us to any such admissions in the appellate record. And Safeway cites no authority in support of its suggestion that the plaintiffs were required to submit declarations (or other evidence) outlining their inability to understand their wage statements in order to avoid an adverse ruling on the in limine motion. Further, Safeway misapprehends the law by claiming the trial court correctly held that section 226 was not violated because drivers could conduct a "comparison" of their ROEs with their trip sheets. As for Safeway's liability on the wage statement claim, the question is whether Safeway failed to provide accurate and complete information as required by section 226, subdivision (a) and the drivers could not promptly and easily determine *from the wage statement alone* any of the

28

enumerated items (e.g., piece-rate units earned). (§ 226, subd. (e)(2)(B)(i); see *id.*, subd. (e)(2)(C) [" 'promptly and easily determine' to mean 'a reasonable person would be able to readily ascertain the information *without reference to other documents or information*' "]; *Raines, supra*, 23 Cal.App.5th at p. 676, italics added [a plaintiff is "injured" for purposes of section 226, subdivision (e) if the accuracy of any of the enumerated items in section 226, subdivision (a) cannot be ascertained from the four corners of the wage statement]; *Lubin v. The Wackenhut Corp.* (2016) 5 Cal.App.5th 926, 959 ["section 226, subdivision (e)(2)(B)(i) clarifies that injury arises from defects in the wage statement, rather than from a showing that an individual experienced harm as a result of the defect"].)

Equally without merit is Safeway's contention that the trial court did not err because plaintiffs presented no proof of a knowing and intentional violation of section 226. As an initial matter, Safeway forfeited this issue by failing to raise it in connection with its motion in limine. We do not consider arguments raised for the first time on appeal. (*Franz v. Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 143; *Westcon Construction Corp. v. County of Sacramento* (2007) 152 Cal.App.4th 183, 194.) In any event, Safeway has made no showing that plaintiffs were required to offer evidence on this issue to avoid an adverse ruling on the in limine motion. The issue of whether there was a knowing and intentional failure by Safeway to comply with section 226, subdivision (a) is a question of fact for the jury. (See *Kao v. Holiday, supra*, 12 Cal.App.5th at p. 961 [a knowing and intentional violation occurs "if the employer 'knew that facts existed that brought its actions or omissions within the provisions of [the statute]' [citation] or, in other words, 'was aware of the factual predicate underlying the violation' "].)[15]

---

[15] In view of our conclusions, we need not and do not consider any of the other arguments raised by the parties.

## DISPOSITION

The order granting Safeway's motions in limine is reversed.  The judgment is reversed, and the matter is remanded for further proceedings consistent with this opinion. Plaintiffs shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)


                                           /s/
                                     Duarte, Acting P. J.


We concur:


/s/
Krause, J.


/s/
Earl, J.